UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JEFFREY ALAN WEISHEIT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 4:19-cv-00036-SEB-DML |
| | ) | |
| RON NEAL, | ) | |
| | ) | |
| Respondent. | ) | |

**Order Denying Petition for Writ of Habeas Corpus**

Jeffrey Alan Weisheit was found guilty of setting fire to his home in the middle of the night and killing his girlfriend's two children—eight-year-old Alyssa Lynch and five-year-old Caleb Lynch. An Indiana jury convicted him of two counts of murder and one count of arson, and the trial court sentenced him to death. He has brought this 28 U.S.C. § 2254 petition for writ of habeas corpus challenging his convictions and death sentence. For the reasons outlined below, the petition for writ of habeas corpus is **denied**, but a certificate of appealability is **granted** as to Mr. Weisheit's claims of ineffective assistance of trial and appellate counsel and a finding of procedural default.

## I.      Background

We begin with an overview of the crimes of which Mr. Weisheit was convicted and the procedural history leading up to those verdicts. Additional facts relevant to individual claims are included throughout the Order.

A.      **Mr. Weisheit's Crimes**[1]

In April 2010, Mr. Weisheit was living in Evansville, Indiana, with his girlfriend, Lisa Lynch, and her two children, Alyssa and Caleb. Lisa and Mr. Weisheit had discussed their possible marriage, prompting him to begin making payments on a wedding ring for Lisa.  When Lisa became pregnant, Mr. Weisheit developed doubts about whether the child was his. He stopped making payments on the ring and attempted to get a refund from the jeweler. Dkt. 88-24 at 127−28 (David Krantz testimony); dkt. 88-26 at 83−84 (Jeffrey Weisheit testimony). Two weeks before the house fire, Mr. Weisheit abruptly quit his job. Dkt. 88-24 at 149 (Martha Cavanah testimony) ("He stormed out, peeled out in the parking lot, just left erratically."). That same day he withdrew all the funds in his bank account. Dkt. 88-26 at 66 (Jeffrey Weisheit testimony). He previously had told a friend that "if he found out that [Ms. Lynch] was having an affair he would kill her, burn everything, and kill his self." Dkt. 88-24 at 149 (Martha Cavanah testimony).

On the evening of April 9, Mr. Weisheit was home alone with Caleb and Alyssa while Ms. Lynch was at work during the night shift. Around 3:45 a.m. on April 10, a fire at his house was reported. By the time first responders arrived, the house was engulfed in flames and Mr. Weisheit along with his car were gone.

Mr. Weisheit did not answer phone calls placed to him by anyone, including by Ms. Lynch. Officers eventually succeeded via OnStar to track his location in Boone County, Kentucky, more than 200 miles away. After local law enforcement in Kentucky identified his car, Mr. Weisheit engaged them in a high-speed chase, which ended only after three of his four tires had been deflated by the officers. Dkt. 88-23 at 109 (Matthew Kremer testimony). Mr. Weisheit exited the car

---

[1] Except where noted by citation to the trial record, this summary of the trial evidence is drawn from the Indiana Supreme Court's decision on direct appeal. *Weisheit v. State*, 26 N.E.3d 3 (Ind. 2015). The state court's factual determinations are presumed correct, requiring Mr. Weisheit to rebut that presumption, if he can, by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

brandishing a knife and shouting to the officers, "Come on, fucking kill me, mother fuckers, I want to die." Dkt. 88-23 at 139 (Jeffrey Weisheit testimony). Mr. Weisheit then threw a knife at an officer, prompting two other officers to shoot him with their tasers. Mr. Weisheit collapsed onto the pavement and struck his head, causing a mild concussion. *See* dkt. 88-27 at 237 (David Price testimony). Officers found $4800 in cash on Mr. Weisheit's person, plus another $895 in cash in his wallet. Dkt. 88-23 at 141−42 (Jason Noel testimony); *id.* at 159−60 (Jeremy Rosing testimony).

Meanwhile, in Evansville, the fire department managed to extinguish the fire at Mr. Weisheit's home and, together with law enforcement, began a search for bodies. Tragically, their search lead them first to five-year-old Caleb, who was found lying face down on his bed with both his wrists and feet bound by duct tape. Dkt. 88-25 at 91 (Allen Griggs testimony). His mouth was also taped shut; when the tape was subsequently removed to examine Caleb's teeth, the dentist discovered a rag shoved into his mouth. Dkt. 88-25 at 64−65 (Barbara Wells testimony); dkt. 88-17 at 106 (photograph). The rag had traces of bile on it, indicating that Caleb had gagged and vomited while it was in his throat. Dkt. 88-25 at 64−65 at 66. There was also soot in Caleb's larynx, indicating that he had been alive and breathing—though only through his nose—during the fire. Dkt. 88-25 at 95−96 (Allen Griggs testimony). Two remnants of railroad flares were found on or near Caleb's body: one in his underwear, (Dkt. 88-17 at 131 (photograph)), having burned his left thigh while he was still alive; the other located under his body.

Eight-year-old Alyssa's body was not found at the scene of the fire until the afternoon of April 10th, located in a closet with burns covering approximately 90 percent of her body. Dkt. 88-25 at 84 (Allen Griggs testimony). She was determined to have died from smoke inhalation, though investigators were uncertain as to whether she was already dead or still alive when her body was burned. *Id.* at 85−89.

Following his arrest, while at the hospital, Mr. Weisheit provided an oral statement to officers, *see* dkt. 88-17 at 111−30 (transcript of recorded statement), preceded by his *Miranda* warnings, which he stated that he understood. *Id.* at 114. Though Mr. Weisheit answered a few questions, he provided little by way of detail about the fire or the death of the children. He admitted leaving Caleb and Alyssa alone in the home on the night of April 9, but denied any knowledge of the origins of the fire and the harm to the children. *Id.* at 115−30.

### B.    Pretrial and Trial Proceedings

The State of Indiana charged Mr. Weisheit with two counts of murder and one count of arson including a request for the death penalty. *Weisheit I*, 26 N.E.3d at 7. Defense counsel's motion to suppress Mr. Weisheit's post-arrest statement to officers was denied based on the Court's finding that the statement had been voluntary and was thus admissible. *Id.* at 17.

Following the prosecution's evidence, the defense called several witnesses, including Mr. Weisheit, who testified against his counsel's advice. Dkt. 88-26 at 51−52. He testified that he had quit his job in March 2010 because he was angry at his boss and explained that he had withdrawn all the money from his bank account before he fled because he had been worried that automatic withdrawals would deplete the funds in the account. Dkt. 88-26 at 65.

Regarding the night of the fire, Mr. Weisheit testified that Caleb had refused to go to bed and wanted to continue playing. *Id.* at 66. Mr. Weisheit said he "got real mad" at Caleb and in reaction to his anger taped the boy's hands behind his back. *Id.* According to Mr. Weisheit, Caleb "kept saying [he was sorry] over and over," prompting Mr. Weisheit to shove a rag into his mouth and cover it with duct tape. *Id.*

Mr. Weisheit's anger continued, leading him to pack up his clothes along with some of Ms. Lynch's jewelry and drive away from the house in an attempt to "cool down." *Id.* at 66−68.

4

He left the house around 1:00 a.m. and drove around Evansville until deciding to drive to Cincinnati. *Id.* at 68. When the police caught up with him and tried to stop him, his evasionary efforts stemmed simply from his wanting to be left alone. *Id.* When police finally did succeed in stopping him, his shouts at the officers and his knife throwing were intended to provoke the officers into shooting him. *Id.* at 69.

For the most part Mr. Weisheit did not dispute the State's evidence at trial, though he did deny setting the fire. *Id.* at 72. On cross-examination, he admitted to having brought the railroad flares into the house when he first moved in, but could not explain how one flare ended up in Caleb's underwear. *Id.* at 74. He testified that he believed the fire had started from an electrical event due to the improper wiring of two ceiling fans. *Id.* at 77.

In response to the prosecutor's question on cross-examination of Mr. Weisheit, when asked: "So it just so happens that on the night you decided to pack up and leave, with all of your belongings, on the night you so happen to have hogtied Caleb with duct tape, and there so happened to be found three flares under his body, one in his underwear, there was a malfunction?", Mr. Weisheit responded, "Things happen." *Id.*

The jury returned verdicts of guilty as charged on all three offenses. Dkt. 88-26 at 173−74.

During the penalty phase of the post-trial proceedings, the State incorporated all the evidence that had been presented during the guilt phase. *Id.* at 196−97. In defense, Mr. Weisheit called 18 witnesses, which included members of his family, various friends, a former neighbor, a former teacher, a counselor from the Indiana Boys School where he had been in custody as a juvenile, his former therapist, a jail officer, and two psychological experts. *See generally* dkt. 88-26 at 198−250, dkt. 88-27 at 1−249, and dkt. 88-28 at 1−26. The thrust of the defense was primarily to demonstrate that Mr. Weisheit suffered from bipolar disorder and that he had

committed these crimes during an uncontrolled manic state.[2] The State called two expert witnesses in rebuttal. Dkt. 88-28 at 27−84.

Following deliberations, the jury concluded that four statutory aggravating circumstances had been established which outweighed the mitigating circumstances and recommended imposition of a sentence of death. *Id.* at 130−31. In concurrence with the jury, the trial court imposed the death penalty on each of the two murder convictions and imposed a twenty-year consecutive prison term for the arson. Dkt. 88-28 at 152; *Weisheit I*, 26 N.E.3d at 4.

### C.    Direct Appeal and Post-Conviction Review

Mr. Weisheit filed a direct appeal to the Indiana Supreme Court, raising seven claims:

- the trial court's exclusion of James Aiken's testimony, in violation of his Eighth Amendment rights;

- his arson conviction was based on insufficient evidence;

- the trial court's refusal to dismiss several jurors for cause, thereby requiring him to exhaust his peremptory challenges, which was an abuse of discretion;

- the "thank you" note sent by the wife of a juror to the jury as a whole constituted a prejudicial outside communication, in violation of his Sixth Amendment right to an unbiased jury;

- his murder convictions were based on insufficient evidence;

- his involuntary statement given to police at the hospital and introduced into evidence at trial, in violation of the Fifth and Sixth Amendments; and

- his sentence of death.

*See generally* dkt. 86-5. The Indiana Supreme Court, in a unanimous opinion, affirmed Mr. Weisheit's convictions on all grounds. *Weisheit I*, 26 N.E.3d at 21.

---

[2] Mr. Weisheit also called James Aiken, a retired Indiana Department of Correction Commissioner, to testify regarding the Indiana Department of Correction's ability to safely house Mr. Weisheit in prison, *see* dkt. 88-27 at 149, but this testimony was excluded. *Id.* at 171−72.

Mr. Weisheit next filed a petition seeking post-conviction relief. Following an evidentiary hearing, the relief sought was denied in a thorough and exhaustive (81-page) written order. Dkt. 22-34. Mr. Weisheit appealed that denial, arguing that his trial and direct appeal counsel were ineffective in the following ways:

- during voir dire, for failing to ensure that jurors would consider a term of years sentence if they found him guilty;

- during the suppression hearing, for failing to introduce evidence to establish that Mr. Weisheit had not wanted to sign the *Miranda* waiver at the hospital prior to making his statement to law enforcement;

- during the guilt phase of trial, for failing to object to the opinion testimony of three experts - a local fire department official, the state fire marshal, and a police detective - each of whom testified that the fire at Mr. Weisheit's house was intentionally set;

- during the penalty phase of trial, for counsel's failure to:

  o obtain records regarding Mr. Weisheit's stay at the Indiana Boys School for submission to and review by his expert witnesses;

  o call Dr. Philip Harvey as an expert witness;

  o call Dr. Ruben Gur as an expert witness (or another such witness) to testify about Mr. Weisheit's history of mild traumatic brain injury; and

  o submit a more convincing offer of proof regarding the excluded testimony of James Aiken;

- the prejudicial effect of these cumulative errors; and

- on appeal, counsel's failure to adequately brief a "biased jury" claim as part of his direct appeal.

*See generally* dkt. 86-15. In a split decision, the Indiana Supreme Court affirmed Mr. Weisheit's convictions. *Weisheit v. State*, 109 N.E.3d 978 (Ind. 2018) ("*Weisheit II*"). One justice concurred in part and concurred in the judgment, concluding that trial counsel performed deficiently at the penalty phase but agreeing with the majority that Mr. Weisheit was not prejudiced by counsel's ineffectiveness. *Id.* at 994−96 (Slaughter, J., concurring in part and in the judgment). Another

justice dissented in part and concurred in part, concluding that trial counsel's penalty phase performance was both deficient and prejudicial. *Id.* at 996−1021 (Rush, C.J., concurring in part and dissenting in part).

On January 17, 2020, Mr. Weisheit filed a petition for writ of habeas corpus in this Court one year to the day following the Indiana Supreme Court's denial of rehearing of his post-conviction appeal. Dkt. 21. On September 4, 2021, he filed an amended petition, which is the operative petition before us here. Dkt. 67. The amended petition advances 33 "claims," and though many are not actually separate claims, rather, they comprise specific allegations in support of Mr. Weisheit's ineffective assistance of counsel claims.[3] *Id.* Mr. Weisheit has recently filed two motions to stay these proceedings: the first, based on his alleged incompetence, dkt. 95, and the second, to allow him to return to state court to litigate allegedly unexhausted claims, dkt. 112. We address the motions to stay below:

## II.     Defaulted Claims and Motion to Stay for Exhaustion

Well-established case law provides that if a petitioner in custody pursuant to a state court judgment raises a claim on federal habeas review without first presenting it through "one complete round of the State's established appellate review process," and there is no available avenue left to raise the claim in state court, the claim is procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Johnson v. Foster*, 786 F.3d 501, 504 (7th Cir. 2015). To excuse the default in an effort to obtain relief on a procedurally defaulted claim, a petitioner must show either "cause and prejudice" or "that the court's failure to consider the defaulted claim would result in a fundamental miscarriage of justice." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013).

---

[3] For consistency, the Court adopts Mr. Weisheit's format in laying out his claims.

Mr. Weisheit concedes that he has failed to present Claims 1, 2, 3, 5, 6, 7, 8, 10, 13, 14, 17, 18, 19, 20, 21, 22, 25, 29, 30, 31, 32, and 33 through one complete round of Indiana's ordinary appellate review process. Dkt. 107 at 10. He contends that he could successfully muster a defense for these defaults, but only with evidence that exists outside the current state-court record. *Id.* at 10−11 ("[E]ach may require evidentiary development beyond the trial court record to establish cause to excuse the default and to establish the factual development of the underlying record."). He therefore seeks a stay of these proceedings to allow him to return to state court to develop a sufficient record. We decline to grant him his request for a stay.

## A.     Applicable Law

Until recently, many federal courts allowed petitioners to expand the record in federal habeas proceedings to excuse defaulted claims based on the alleged ineffective assistance of trial counsel. *See Brown v. Brown*, 847 F.3d 502, 517 (7th Cir. 2017) (remanding for evidentiary hearing on ineffective assistance of post-conviction counsel and noting that, if the default is excused, petitioner "will be entitled to an evidentiary hearing on the merits in the district court for the underlying claim of ineffective assistance of trial counsel").

However, under current statutes, if a petitioner "has failed to develop the factual basis of a claim in State court proceedings," a federal court can conduct an evidentiary hearing or consider evidence outside the state-court record for that claim only if —

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The Supreme Court recently ruled that, for purposes of § 2254(e)(2), "state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022). Thus, to be permitted to expand the record in this Court, Mr. Weisheit must be able to satisfy one of the § 2254(e)(2) exceptions. His inability to establish actual innocence under § 2254(e)(2)(B) forecloses any such expansion.

### B.    Discussion

Mr. Weisheit acknowledges that he cannot satisfy § 2254(e)(2) in light of *Shinn*, and, specifically, that he cannot succeed on his defaulted claims without expanding the record. Thus, Mr. Weisheit seeks a stay of his federal proceedings to allow him an opportunity to raise his defaulted claims in state court. Dkt. 112 at 11 ("Following *Shinn*, such evidentiary development . . . to overcome state procedural bars must take place in state court while the federal petition is stayed.").

In his motion to stay proceedings, Mr. Weisheit repeatedly characterizes the relevant claims as "defaulted." *See*, *e.g.*, *d*kt. 112 at 32 ("Petitioner can demonstrate good cause to excuse procedural default of claims he seeks to exhaust."); *id.* at 37 (arguing that "the procedural default [of Claim 5] is attributable to post-conviction counsel's failure to raise this important issue"); *id.* at 38 ("Post-conviction counsel's deficiency amply supplies cause to overcome the default [of Claim 10]."); *id.* at 41 ("As per *Martinez*, equitable principles require excuse of the procedural default [of Claim 18] lest no court ever address this potentially meritorious claim."). However, in his reply in support of his motion, Mr. Weisheit changes tack, insisting that his claims are

unexhausted, rather than procedurally defaulted, because state procedures are available that would allow him to bring these claims. Dkt. 117 at 5−8; *cf. Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004) (explaining that a claim that has not been fully and fairly presented in state court is unexhausted if "state remedies remain available" and procedurally exhausted if "there is no longer any state corrective process available").

Mr. Weisheit identifies two state procedures as being available to him: a successive post-conviction petition and a petition to the Supreme Court based on "new evidence," pursuant to Indiana Code § 30-50-2-9(k). However, he has not been successful in establishing that either statutory route is actually available to him. Our review brings us to the conclusion that Mr. Weisheit's claims are, in fact, defaulted, not merely unexhausted, for the reasons explicated hereafter:

Under Indiana law, "[c]laims that could have been, but were not, raised in earlier proceedings and otherwise were not properly preserved are procedurally defaulted; we do not authorize the filing of successive petitions raising [such] forfeited claims." *Matheney v. State*, 834 N.E.2d 658, 662 (Ind. 2005). The ineffective assistance of post-conviction counsel ordinarily does not excuse a petitioner's failure to bring such a claim in his first post-conviction petition. *Baird v. State*, 831 N.E.2d 109, 117 (Ind. 2005). So long as post-conviction counsel "'in fact appeared and represented the petitioner in a procedurally fair setting,'" a petitioner cannot seek to raise a claim in a successive petition that could have been brought in the original one. *Graves v. State*, 823 N.E.2d 1193, 1196 (Ind. 2005) (quoting *Baum v. State*, 533 N.E.2d 1200, 1201 (Ind. 1989)). In other words, a petitioner must establish that he was "abandoned" by post-conviction counsel. *Hill v. State*, 960 N.E.2d 141, 150 (2012) (denying relief on successive petition because original post-conviction counsel "far from abandoned" petitioner). Mr. Weisheit does not contend that his

post-conviction counsel abandoned him, and the record does not support such a finding. Thus, he has failed to show that he is entitled to file a successive state post-conviction petition on that claim.

Similarly, Mr. Weisheit has not identified any "new evidence" that would permit the filing of a successive petition to Indiana Supreme Court under Indiana Code § 35-50-2-9(k); *see Pruitt v. State*, 903 N.E.2d 899, 933 (Ind. 2009) ("[T]he evidence must be discovered since the trial, *and* the defendant must have used due diligence to discover it before trial." (cleaned up) (emphasis retained)). He has therefore failed to show that this avenue of redress is available to him.

Because no state court pathway remains available to him, Mr. Weisheit's claims are procedurally defaulted. *Perruquet*, 390 F.3d at 514. But even if Mr. Weisheit's claims were deemed unexhausted, rather than defaulted, entry of a stay would not be appropriate. The United States Supreme Court has directed that a stay of a mixed petition is appropriate only where (1) "there was good cause for the petitioner's failure to exhaust," (2) the claims are not "plainly meritless," and (3) the petitioner has not engaged in "abusive litigation tactics or intentional delay." *Rhines v. Weber*, 544 U.S. 269, 277−78 (2005). We find that Mr. Weisheit has failed to satisfy the first and third prongs of this test.

If, as Mr. Weisheit asserts, a state court process is available to him to exhaust his claims, that process was equally available to him in February 2019, when he initiated this action by moving for appointment of counsel. Dkt. 1. It was also available to him in January 2020, when he filed his first § 2254 petition—which included his acknowledgement that several claims were either unexhausted or procedurally defaulted for failure to complete one complete round of state court review. Dkt. 21. And it was available to him in September 2021, when he filed his amended § 2254 petition, dkt. 67. Yet, even now, no motion for leave to file a successive post-conviction petition nor a petition to the Indiana Supreme Court based on new evidence has been filed by Mr. Weisheit.

Over the past three-and-a-half years, Mr. Weisheit has advanced no good cause showing for his failure to exhaust or even attempt exhaustion. He maintains that prior to *Shinn* he had no reason to go to state court, because he "anticipated presenting newly developed evidence in the federal court." Dkt. 112 at 21. But a preference for litigating in federal court does not constitute "good cause" sufficient to overcome a failure to exhaust the process available in state court. If Mr. Weisheit had an available state-court avenue for relief, he was statutorily required to pursue it before litigating his claims (for years) in federal court. 28 U.S.C. § 2254(b); *See Yeoman v. Pollard*, 875 F.3d 832, 837 (7th Cir. 2017) ("[T]he court may grant a stay and abeyance only when the petitioner demonstrates good cause for failing to exhaust his or her claims *first* in state court." (emphasis added)). He is not entitled at this juncture to pursue as a fallback option an attempt to avail himself of state court procedures when the federal process is no longer available to him.

Accordingly, Mr. Weisheit's motion to stay proceedings pending a return to state court to secure exhaustion of his claims, dkt. [112], is **denied**. Claims 1, 2, 3, 5, 6, 7, 8, 10, 13, 14, 17, 18, 19, 20, 21, 22, 25, 29, 30, 31, 32, and 33 are thus procedurally defaulted, foreclosing relief to Mr. Weisheit unless and until he can establish cause and prejudice sufficient to excuse the defaults, *Davila v. Davis*, 137 S. Ct. 2058, 2064−65 (2017).   However, because the record before us does not reflect any legally sufficient cause to excuse the defaults, these claims are **denied** as defaulted.

### III.    Non-Defaulted Claims

#### A.    Applicable Law

##### 1.    Section 28: § 2254(d)

A successful state petitioner's petition for writ of habeas corpus must establish that the petitioner's custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

13

After a state court has adjudicated the merits of a petitioner's claim, federal habeas relief is unavailable, unless the state court's adjudication—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc). Where no state court has adjudicated the merits of petitioner's claims, or where either prong of § 2254(d) is met, federal habeas review is *de novo*. *Thomas v. Clements*, 789 F.3d 760, 766−68 (7th Cir. 2015).

### 2.     *Strickland v. Washington*

Many of Mr. Weisheit's claims before us focus on his allegations of ineffective assistance of counsel. To succeed on such a claim regarding trial counsel, a petitioner must show that counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 689−92 (1984); *Dunn v. Neal*, 44 F.4th 696, 706−07 (7th Cir. 2022). Counsel's performance is "deficient" if it "fell below an objective standard of reasonableness" and "prejudicial" if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

### B.     Sufficiency of the Evidence for Arson Conviction (Claim 15)

Mr. Weisheit's claim based on his arson conviction is that it lacked a legally sufficient evidentiary basis. Applicable Supreme Court decisions clearly establish that a criminal conviction may stand only if "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he relevant question is

14

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

The Indiana Supreme Court addressed and resolved this claim on Mr. Weisheit's direct appeal. *Weisheit I*, 26 N.E.3d at 11−12. While the Court did not specifically rely on *Jackson*, it correctly set forth and applied the *Jackson* standard: "Appellate courts affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt." *Id.* at 11. Applying that test, the Court reasonably concluded that the evidence adduced during Mr. Weisheit's trial easily satisfied this requirement.

Mr. Weisheit argues that "[t]he circumstantial evidence presented to the jury was too speculative to warrant conviction." Dkt. 67 at 142. That argument finds no support in the Indiana Supreme Court's opinion, which includes the following itemization of evidence from which the jury could have concluded that Mr. Weisheit intentionally set fire to his home:

- A few months before the fire, Weisheit told a co-worker that if he found out that Lisa was having an affair, he would kill her, then kill himself and burn everything";

- Weisheit told another co-worker that "if he had to get rid of [Lisa] he could. He could pull teeth, cut fingers off, put her in a place nobody would find her." He said if he were to leave, he would go out "[i]n a blaze of glory";

- Weisheit admitted to being very upset that Lisa was pregnant and questioned if the child was his;

- In late March 2010, Weisheit cancelled the layaway plan he was using to purchase an engagement ring for Lisa and told the jewelry store manager that Lisa and he had broken up and that he was going to leave the country;

- Weisheit admitted that he brought railroad flares into the house and was going to work at a railroad the next day;

- The day before the fire, Weisheit quit his job and withdrew all the money in his bank account;

- Weisheit admitted that on the night of the fire, because Caleb did not want to go to bed, he hog-tied the boy and stuffed a twelve-inch-by-twelve-inch washcloth into his mouth;

- Weisheit admitted that on the night of the fire he left the house alone with one child hog-tied and duct taped;

- Weisheit fled the State of Indiana the night of the fire;

- As he fled, Weisheit did not respond to numerous phone calls and refused to speak with Lisa when OnStar contacted him on her behalf;

- Weisheit fled police at speeds exceeding 140 miles per hour;

- When surrounded by police, Weisheit implored the officers to shoot him, threw a knife at officers, and had to be tased into submission;

- Weisheit had $4,800 in cash, clothes, toiletries, and Lisa's jewelry in his possession when he was taken into custody;

- At the hospital, Weisheit selectively answered certain questions by the police but pretended to be asleep when asked about the fire or the children's whereabouts;

- One burnt flare was found stuffed in Caleb's underwear and another was recovered under his body; and

- Fire Marshall Kinder concluded that, based on the totality of the circumstances, the fire that killed Alyssa and Caleb Lynch was started intentionally.

*Weisheit I*, 26 N.E.3d at 11−12.

This evidence provides significantly more than a sufficient basis on which the jury could have concluded that Mr. Weisheit knowingly set fire to his home. Accordingly, we hold that the Indiana Supreme Court reasonably rejected Mr. Weisheit's sufficiency of the evidence claim as to the arson conviction. *Id.* at 12. Relief is therefore barred by 28 U.S.C. § 2254(d), and this claim is **denied**.

### C.       Investigation Testimony—Ineffective Assistance of Counsel (Claim 16)

Mr. Weisheit also alleges that trial counsel was ineffective for his failure to object to the testimony by a local fire department official, the state fire marshal, and the lead police detective, all of whom testified to their opinions that the fire in Mr. Weisheit's home was intentionally set.

The Indiana Supreme Court addressed and resolved these allegations of ineffectiveness in connection with the post-conviction appeal.

As for the testimony of the local fire department official and the state fire marshal, the Indiana Supreme Court found no deficiency or prejudice, ruling that the opinions were admissible under the Indiana rules of evidence. *Weisheit II*, 109 N.E.3d at 991 (citing Indiana Rule of Evidence 704(b)). It is not our role to dispute or contradict the Indiana Supreme Court's application of Indiana's evidentiary rules, even when such evidentiary ruling may be dispositive as to the federal ineffective assistance of counsel claim., *Sennholz v. Strahota*, 722 Fed. App'x 569, 571−72 (7th Cir. 2018); *cf. Miller v. Zatecky*, 820 F.3d 275, 276 (7th Cir. 2016) (relief unavailable on ineffective assistance of appellate counsel claim; in light of state court's ruling on underlying state-law issue, petitioner's "chance of success was zero"). Thus, the testimony of these fire protection officials stands, given the Indiana Supreme Court rulings.

The Indiana Supreme Court was less clear, however, as to whether the police detective's testimony was properly admitted. *Weisheit II*, 109 N.E.3d at 991 ("While defense counsel arguably could have objected, it is not clear such an objection would be sustained because defense counsel may have opened the door."). Regardless of any deficiency in counsel's performance, the Indiana Supreme Court held that Mr. Weisheit was not prejudiced by such testimony because "the expert testimony was not nearly as persuasive as Weisheit's actions before, during, and after the crime." *Id.* at 992.

17

This holding represents a reasonable application of *Strickland*. Given that the evidence of Mr. Weisheit's guilt was overwhelming, the lead police detective's opinion testimony likely had at most a minor impact on the jury's verdict in part because it was cumulative of the testimony of the fire officials and was of much less significance compared to all the other evidence of Mr. Weisheit's guilt. This ineffectiveness claim in this respect is therefore unavailing and barred by § 2254(d).

### D.   Biased Jury (Claims 9 and 11)

Mr. Weisheit next argues that his Sixth and Fourteenth Amendment rights to an unbiased jury were violated and also that appellate counsel was ineffective in failing to properly assert this a claim on direct appeal. We address each contention in turn below:

### 1.   Due Process and Sixth Amendment Right to Unbiased Jury (Claim 9)

Mr. Weisheit contends that the trial court improperly denied his for-cause objections to several members of the venire, forcing him to use peremptory strikes and resulting in the empaneling of at least one biased juror and in refusing to voir dire to determine whether jurors could or would consider a sentence other than the death penalty. Dkt. 67 at 112−20. The Supreme Court has made clear that a defendant is entitled to an impartial jury under the Sixth Amendment, and even one juror "who will automatically vote for the death penalty in every case" violates that right. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Regarding the court's refusal to grant for cause strikes of certain jurors, "peremptory challenges are . . . a means to achieve the end of an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.*

The Supreme Court has also clearly ruled that state defendants have a Fourteenth Amendment due process right to exercise peremptory challenges to the extent they are afforded under state law. *Id.* at 88−89. But "there is no freestanding constitutional right to peremptory challenges." *Rivera v. Illinois*, 556 U.S. 148, 157 (2009). "If a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern. Rather, it is a matter for the State to address under its own laws." *Id.*

The Indiana Supreme Court fully considered and adjudicated this claim on direct appeal. Its denial of the claim based on Mr. Weisheit's failure to identify any biased juror who was actually empaneled was a legally reasonable conclusion. *Weisheit I*, 26 N.E.3d at 13 ("[Mr. Weisheit's] conclusory assertion that he was forced to accept biased jurors is not nearly enough for us to find reversible error. At oral argument, Weisheit conceded as much."). Under *Ross*, and other applicable Supreme Court precedents, we thus hold that the decision of the Indiana Supreme Court on this issue in its entirety was reasonable.

Mr. Weisheit has recently supplemented his original jury bias claim to specify that at least one "biased or objectionable juror" was empaneled. Dkt. 67 at 119−20. Even so, we hold that the Indiana Supreme Court did not unreasonably reject this claim as it was presented in that forum. *See Felton v. Bartow*, 926 F.3d 451, 467 n. 5 (7th Cir. 2018) (state court reasonably found no prejudice based on arguments briefed in state court). To the extent Mr. Weisheit now seeks to raise a different claim in the case at bar, it has been procedurally defaulted. *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004) ("[W]hen the habeas petitioner has failed to fairly present to the state courts the claim on which he seeks relief in federal court and the opportunity to raise that claim in state court has passed, the petitioner has procedurally defaulted that claim.").

### 2.      Ineffective Assistance of Appellate Counsel (Claim 11)

Mr. Weisheit contends that his appellate counsel was ineffective in failing to argue (a) that Jurors 1, 2, 8, and 9 were "blatantly biased" against him, and (b) that a more favorable state-law standard governed his claim. Dkt. 67 at 123−26.

Mr. Weisheit concedes that the "more favorable state-law standard" issue in part (b), *supra*, has been procedurally defaulted. Though he does not concede that part (a) has, for the most part, also been procedurally defaulted, we hold that it has been. In the Indiana Supreme Court on post-conviction appeal, Mr. Weisheit raised this ineffective assistance of appellate counsel claim but only as to Juror 2.[4]  This claim thus has clearly been defaulted as to all the other jurors. *Pole v. Randolph*, 570 F.3d 922, 935 (7th Cir. 2009) ("[I]f a petitioner fails to assert in the state courts a particular factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted.").

In adjudicating this claim relating to Juror 2 on post-conviction appeal, the Indiana Supreme Court concluded that appellate counsel's performance was neither deficient nor prejudicial. *Weisheit II*, 109 N.E.3d at 993. Our review leads us to hold that this prejudice determination by the Supreme Court was reasonable.[5]

---

[4] We refer to the jurors by their numbers they were assigned at trial. The Indiana Supreme Court refers to this juror as "Juror 7," based on his designation before trial. *Weisheit II*, 109 N.E.3d at 992.

[5] The Indiana Supreme Court's deficiency analysis on post-conviction appeal is difficult to square with its direct appeal decision. On post-conviction appeal, the Court explained,

> [C]ounsel provided significant relevant information about Juror [2]'s views that appears on the same page as the quote Weisheit prefers. In any case, this Court in reaching its decision is not limited to only what the parties discuss and cite in their briefs. Instead, we "review relevant portions of the record" thoroughly and "often decide cases based on legal arguments and reasoning not advanced by either party." The language quoted by the parties is only the starting place for our review and decision-making.

*Weisheit II*, 109 N.E.3d at 993. On direct appeal, the Indiana Supreme Court had rejected Mr. Weisheit's claim of a biased jury due to his failure to identify any objectionable juror who was actually empaneled. *Weisheit I*, 26 N.E.3d at 13. Regardless, our analysis and determination may permissibly turn only on the

During voir dire, defense counsel presented Juror 2 with the following hypothetical:

> Murder of two children, eight and five, and an arson. No defenses, no mental illness that would excuse it, no retardation that would excuse it, no drugs, no alcohol defenses that you would consider, just kind of stone cold-blooded killer of two innocent children. Is death the only appropriate penalty for that kind of a guilty murder?

Dkt. 88-18 at 141. Juror 2 answered in the affirmative. *Id.* Juror 2 also chose "somewhat agree" as the appropriate response on the questionnaire to "an eye for an eye." *Id.* at 142.

The Indiana Supreme Court acknowledged that Juror 2 "states a strong preference for the death penalty under facts like the ones of this case." *Weisheit II*, 109 N.E.3d at 993. But it also noted that the facts included in the hypothetical were not "all the facts" in the case tried to the jury. *Id.* Mr. Weisheit included mitigating circumstances evidence during the penalty phase of trial, including his bipolar disorder. He also argued that the murders were not "cold blooded," rather, simply impulsive acts driven in part by an episode of mania reflective of his history of mental illness and his reckless behavior during the aftermath of the crime. The Indiana Supreme Court also accurately noted that Juror 2 explained at another point during voir dire that he did not believe the death penalty was "always the right thing to do," stating that "it depends on the facts and circumstances of an individual case as applied." Dkt. 88-18 at 121; *Weisheit II*, 109 N.E.3d at 993. Given these facts in the properly expanded record, we find that the Indiana Supreme Court's determination that Mr. Weisheit was not prejudiced by the failure of his direct appeal counsel to assert Juror 2's alleged bias was reasonable. Thus, relief on this claim is barred by § 2254(d).

### E.    Use of Hospital Statement (Claim 4)

Mr. Weisheit contends that the introduction of his statement at trial, which he had provided to law enforcement during his hospital stay, violated his Fifth and Sixth Amendment rights because

---

lack of prejudice factor, without addressing whether the Indiana Supreme Court's deficiency determination on post-conviction appeal was reasonable.

the statement was not voluntarily given. Supreme Court precedent clearly establishes that the introduction of an involuntary custodial statement violates the Fifth and Sixth Amendments. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). The test for voluntariness "takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* (cleaned up). In analyzing voluntariness of statements by a defendant, the ultimate question for the court to determine is "whether a defendant's will was overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The trial court denied Mr. Weisheit's motion to suppress his statement, finding "no proof of Mr. Weisheit losing consciousness and not being aware of his rights during the interview. To the contrary, the medical proof is that he was alert and oriented."Dkt. 88-2 at 245−46. In its ruling on appeal, the Indiana Supreme Court also credited the state court's finding that "the officers conducting the interview did not demonstrate any coercive or overbearing conduct." *Weisheit I*, 26 N.E.3d at 17 (cleaned up).

The Indiana Supreme Court, in adjudicating Mr. Weisheit's direct appeal, concurred in the trial court's assessment that Mr. Weisheit's statement had been voluntarily provided. *Weisheit I*, 26 N.E.3d at 18. The Indiana Supreme Court also relied upon and applied the correct legal standards, including its reasonable deference towards the trial court's factual findings, including that "the officers conducting the interview did not demonstrate any coercive or overbearing conduct." *Id.* at 17 (cleaned up).

Our court applies § 2254(d)(1) in analyzing the legal conclusion that Mr. Weisheit's hospital-derived statement was voluntary, while § 2254(d)(2) and § 2254(e)(1) provide the statutory guidance for reviewing the state courts' underlying factual determinations. *See Dassey v.*

*Dittman*, 877 F.3d 297, 316 (7th Cir. 2017) ("Because the Wisconsin appellate court accepted the trial court's findings of fact, we review the trial court's factual determinations directly.").

We have no difficulty reaching the decision that Mr. Weisheit has not successfully established the unreasonableness of the state trial court's factual findings. He challenges the officers' testimony that he pretended to drift into sleep when they asked more pointed questions about what he had done to Caleb and Alyssa. Dkt. 67 at 98−102. However, importantly, the state trial court's ruling was based on the audio recording of Mr. Weisheit's statement,[6] plus the testimony of the detectives, medical providers, and a neurological expert witness. We do not reweigh that evidence *de novo*. On the record before us, we conclude that Mr. Weisheit's attempt to demonstrate that the trial court's assessment of the evidence was unreasonable is unavailing.

Finally, Mr. Weisheit contends that the officers interviewing him at the hospital made conflicting comments that effectively nullified his *Miranda* warnings, when they said: "You need to sit up here and talk to us" and "So you need to tell me what happened to those babies and you need to tell me what happened in that house last night." Dkt. 67 at 97. In reviewing this claim and these statements, both the trial court and Indiana Supreme Court determined that the officers' conduct was neither "coercive or overbearing." *Weisheit I*, 26 N.E.3d at 17 (cleaned up). Their

---

[6] Our own review of the audio recording reveals misstatements by counsel representing Mr. Weisheit in the petition before us in at least one material respect concerning his interrogation by law enforcement officers. In his amended petition, Mr. Weisheit states that he invoked his right to counsel, as follows: "I wanna talk to a lawyer, should of [sic] had the right to remain silent." Dkt. 67 at 97 (alteration in amended petition). Counsel argues that this statement "made no reference to the [*Miranda*] warnings, and it was as if he had been denied his right to remain silent." *Id.* However, the transcript of the audio recording proves otherwise: near the 19-minute mark in the audio recording, Mr. Weisheit is heard to say, "I'll talk to the lawyer. You said I had the right to remain silent." Dkt. 67-33 at 18:57−19:02. This statement refers to the *Miranda* rights that had been read to Mr. Weisheit some 15 minutes prior. *Id.* at 2:53−3:34. As such, this statement provides further support for the state trial court's finding that Mr. Weisheit was alert, oriented, and aware of his rights.

findings, we hold, were not unreasonable, either as factual determinations or as applications of clearly established law. Relief on this claim is therefore barred by § 2254(d).

### F. Extrajudicial Communication (Claim 12)

#### 1. Claim-specific background

On the first day of Mr. Weisheit's trial, after witnesses began to testify, Juror 10 brought in cookies baked by his wife for his fellow jurors to enjoy. *See* dkt. 88-24 at 237−39 (questioning of Juror 10). Attached to the box of cookies was a note on which was written, "Thank you for your service for the family of Alyssa [and] Caleb Lynch. I will pray for you all to have strength and wisdom to deal with the days ahead. God bless!" Dkt. 67-37 (thank you note).

Each juror and alternate juror was questioned individually about the impact, if any, of this note on their ability to hear and decide the case impartially. Dkt. 88-24 at 223−251; dkt. 88-25 at 4. Jurors 1, 2, 3, and 6 testified that they did not recall seeing the note. Alternate Jurors 1 and 2 observed the note but did not read it. Dkt. 88-24 at 247−50. Juror 9 saw the note, but ignored it and "went straight for the cookies." *Id.* at 236. Jurors 4, 5, 7, 11, and 12, and Alternate Juror 3 said that they had read the note and recalled it, but characterized it as a generic "thank you" note. Each juror stated that the note would not affect his/her objectivity. Juror 7 specifically stated that in his/her view, the note did not seem to be an attempt to sway the jury in either direction. Dkt. 88-24 at 233.

Juror 8 was the only member of the venire who reported that he recalled that the note mentioned Caleb and Alyssa. *Id.* at 234. Juror 8 said that the reference to the children's names came as a surprise, but, after re-reading the note, like the others he concluded it was not an attempt to influence the jury in either direction. *Id.* Juror 8 disputed that the note had struck "a sentimental chord," stating that "it hasn't affected me at all." *Id.* at 235.

Juror 10, who himself had not read the note from his wife, was nonetheless removed from the jury by the judge for having brought in and shared the outside communication. *Id.* at 237−41; dkt. 88-25 at 17−19. As the judge explained to the full jury regarding the removal of Juror 10: "There's nothing negative to be taken about the gentleman I've excused. I just think the process is served better when we don't have circumstances like that that upset our jury process." *Id.* at 20.

### 2.    Constitutional violation based on extrajudicial communication

Mr. Weisheit maintains that the cookie and thank-you note incident entitled him to a mistrial based on the Fourteenth and Sixth Amendments which guarantee him the right to be tried before an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726 (1992). This guarantee encompasses the requirement that "'the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *Patterson v. Colorado ex rel. Atty Gen. of Colo.*, 205 U.S. 454, 462 (1907)). Indeed, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954). "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.").

The Indiana Supreme Court fully and carefully adjudicated this claim on direct appeal. Though it did not directly cite any controlling Supreme Court precedent, it applied the correct legal standard. *Weisheit I*, 26 N.E.3d at 15−16 (explaining that the State bore the burden "to show that the note's message was harmless"). The Court concluded, that "the State successfully rebutted the presumption of prejudice to Weisheit from the note by showing that its contents were harmless and that the note had no influence on the jury." *Id.* at 16. We hold that this determination was reasonable based on the record before us.

Given that the trial judge's finding of no prejudice reflected his assessments of the jurors' responses and demeanor in response to his questioning, (*See* dkt. 88-25 at 207−08), such a determination is "notoriously difficult to overturn under § 2254(d)(2)." *Coleman v. Hardy*, 690 F.3d 811, 817 (7th Cir. 2012).

Mr. Weisheit challenges the Indiana Supreme Court's conclusion as unreasonable.[7] His challenges focus on the words of the note accompanying the cookies, to wit, the jurors' "service for the family of Alyssa [and] Caleb." Dkt. 107 at 33−34. However, as previously detailed, only one juror, Juror 8, recalled that the note mentioned Alyssa and Caleb, and, when asked about the note's effect on him or her, Juror 8 replied, "Oh, I can serve just fine, it hasn't affected me at all." Dkt. 88-24 at 235. Mr. Weisheit has been unable to establish the unreasonableness of the trial judge's as well as Indiana Supreme Court's acceptance of this response.

Mr. Weisheit also contends that his rights were violated when "the state court failed to consider the likely effect on the jurors when they heard Juror 10 repeatedly voice his displeasure at being dismissed, and the other jurors shook their heads in agreement." Dkt. 107 at 34. The trial

---

[7] Mr. Weisheit also asserts without elaboration that the Indiana Supreme Court's adjudication of this claim involved an unreasonable application of clearly established law. However, he does not identify what clearly established law he believes was unreasonably applied, and we likewise do not find any.

judge in analyzing and reacting to Juror 10's statements, found that they "reinforced the decision of the court to remove [Juror] 10." Dkt. 88-25 at 207−08. The trial judge 's admonition to the jury after Juror 10 had been removed did not escape notice by the Supreme Court. *Id.* at 208 ("Then I gave another admonishment to the group as a whole.").

Notably, Mr. Weisheit does not claim that Juror 10's statements created a risk of bias on the part of the remaining venire, apparently conceding that any such claim has been procedurally defaulted. In any event, the record is devoid of any reactions by the other jurors, to Juror 10's statements. Dkt. 88-25 at 78 (Mr. Dennis testified that the other jurors "all just kind of looked and nodded their heads. And then there was general chatter, I guess"). Taking the circumstances as a whole, we find no basis on which to conclude that the Indiana Supreme Court's determination as to the risk of bias was not legally or factually unreasonable.

Mr. Weisheit's final claim regarding the note is that the Indiana Supreme Court's reliance on the jurors' own statements about their ability to keep an open mind was unreasonable. Dkt. 107 at 34−35 ("[T]hough the jurors may have intended to remain uninfluenced by the note, they may not be aware of their own bias."). As support for this contention, Mr. Weisheit cites Justice O'Connor's concurrence in *Smith*, in which she expressed concern that jurors may sometimes not be aware of their own biases. *Id.* at 34 (citing *Smith*, 455 U.S. at 222 (O'Connor, J., concurring). In her concurring opinion, however, Justice O'Connor specifically endorsed the judicial inquiry procedure similar to that undertaken in Mr. Weisheit's trial as a proper tool for rooting out potential bias, a process she characterized as effective in all but a handful of "extreme situations." *Smith*, 455 U.S. at 222 ("I believe that in most instances a postconviction hearing will be adequate to determine whether a juror is biased. A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing

also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case."). The situation under review here involving a thank-you note written by a fellow juror's wife and conveyed to the jury along with a gift of cookies is a far cry from the "extreme situation" referenced by Justice O'Connor that gives rise to an irrebuttable presumption of juror bias. The possibility that a juror was subconsciously impacted undermining the Indiana Supreme Court's factual determination is neither sufficient nor unreasonable.

Having found that the Indiana Supreme Court's adjudication of this claim was not unreasonable, we hold that the relief Mr. Weisheit seeks is barred by § 2254(d).

### G.     Failure to Consider Mitigating Evidence (Claim 28)

Mr. Weisheit next asserts that neither the jury nor the trial judge "meaningfully considered" any mitigating circumstances in deciding whether to impose the death sentence, as evidenced by the absence of any such list of mitigating circumstances on the verdict forms. Dkt. 67 at 211−12. The Indiana Supreme Court addressed and resolved this claim on direct appeal, stating: "[S]imply because the jury and the trial court did not list any mitigating circumstances does not mean that they failed to consider his offered mitigators and weigh them against the four aggravators proven beyond a reasonable doubt by the State." *Weisheit I*, 26 N.E.3d at 20 (emphasis omitted).

Mr. Weisheit cites no clearly established law requiring a verdict form to include or a jury to specifically determine any mitigating factors in determining whether to impose a death sentence. Nor does he provide any other basis on which to find that the jury failed to consider the mitigating evidence he had introduced. Relief on this claim is therefore barred by § 2254(d). *Berkman v. Vanihel*, 33 F.4th 937, 946 (7th Cir. 2022) ("Having failed to come forward with any clearly

established Supreme Court precedent that has imposed such a duty on the trial court, we must conclude that Mr. Berkman has not met his burden under [§ 2254(d)(1)].").

### H.      Indiana Boys School Records—Ineffective Assistance of Counsel (Claim 23)

Mr. Weisheit next contends that his trial counsel was ineffective in failing to obtain and use records from his time when he was incarcerated at the Indiana Boys School. Supreme Court case law clearly directs that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Once again, the Indiana Supreme Court adjudicated this claim on post-conviction appeal, citing relevant Supreme Court cases and applying the proper legal standard. *Weisheit II*, 109 N.E.3d at 984 ("A decision by defense counsel not to present evidence can be deemed reasonable only if it is predicated on a proper investigation of the alleged defense." (cleaned up)). So advised, the Supreme Court ruled that counsel's performance was neither deficient nor prejudicial.

In assessing trial counsel's performance, the Indiana Supreme Court ruled that counsel had made a reasonable attempt to obtain Mr. Weisheit's Indiana Boys School records when he sent a letter of explanation to the Indiana Department of Correction Records Division along with a subpoena for any records concerning Mr. Weisheit's incarceration at Indiana Boys School. Dkt. 89-6 at 239−40. The Director of Operational Support for the Department of Correction replied to counsel's request as follows:

> Enclose you will find your original paperwork on, Jeffrey A. Weisheit, DOC #926126: We search[ed] our records with the information you provided to our office and unsuccessfully we have no match. **After 10 years if an offender doesn't return to our facility we destroy the file.** The only document we have on this

> offender is a card from our Powerway System which is attached. Any further
> questions please feel free to contact Lina Presley, Director of Operational Support
> at [telephone number].

*Id.* at 241 (emphasis added). The letter referenced no other information or existing records, nor were directions provided or suggestions made which counsel failed to pursue. Indeed, the reasonable conclusion based on this letter is that any such records, if they ever existed, no longer do. *See Weisheit II*, 109 N.E.3d at 984.

Mr. Weisheit maintains that post-conviction counsel "had no trouble obtaining" the Indiana Boys School records from the Indiana State Archives. Dkt. 67 at 178. However, it is not enough in terms of establishing counsel's ineffectiveness simply to show that records existed and could have been obtained, had counsel known from whom and where to request them. Before the State courts on appeal, Mr. Weisheit was required to show that his counsel's failure to continue searching for such documentation after the Indiana Department of Correction had reported that the records were destroyed was "outside the wide range of professionally competent assistance." *Pole v. Randolph*, 570 F.3d 922, 945 (7th Cir. 2009). The burden is even higher in our court: Mr. Weisheit must show that there is no "reasonable argument that counsel satisfied" the deferential "professionally competent" standard. *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Mr. Weisheit's arguments fail to comport with this high standard. Citing the post-conviction testimony of his trial mitigation specialist he stated that he has "had the occasion where [he] requested documents and [was] told that they don't exist, but then other efforts produce[d] the documents," (Dkt. 88-34 at 161−62 (Michael Dennis testimony)). Mr. Weisheit ignores the specialist's additional testimony that, despite his 25-year employment history as a mitigation specialist, he has never previously succeeded in obtaining records from the Indiana State Archives. *Id.* at 162−63. Mr. Weisheit has also referenced a certification by a custodian at the Indiana State

Archives attesting that his records had been turned over to the state archives by the Indiana Boys School in accordance with Indiana Department of Correction policy. Dkt. 89-5 at 220 ("DESTROY ten (10) years after discharge, expiration of the sentence or closing of the Department's interest in the case and after SAMPLING by the STATE ARCHIVES DIVISION, ARCHIVES AND RECORD ADMINISTRATION."). However, the record before us does not disclose whether this Indiana Department of Correction policy was known by or publicly available to trial counsel when Mr. Weisheit's records were being sought. Thus, the only information received by counsel clearly reflects that any Indiana Boys School records relating to Mr. Weisheit had been destroyed.

Considered as a whole, this evidence supports the Indiana Supreme Court's reasonable conclusion that Mr. Weisheit's counsel was not deficient in failing to request the records from the Indiana State Archives. Thus, § 2254(d) bars relief for this alleged instance of ineffective assistance of counsel.

### 2.    Prejudice

We hold as well that the Indiana Supreme Court reasonably concluded that Mr. Weisheit was not prejudiced by the counsel's failure to obtain the Indiana Boys School records, a finding that creates an independent bar to the relief sought here by Mr. Weisheit.

We assume that certain subsets of the Indiana Boys School records would have supported Mr. Weisheit's case during the penalty phase of the litigation, had such records existed and been available to him, *i.e.*, evidence of profound family dysfunction, ongoing depression, suicide attempts, hospital admissions for suicide attempts, and a psychotic break. Dkt. 22-34 at 42. However, lacking the corroborating documentary evidence, counsel adduced at least some of this information at trial through the oral testimony of Deborah Eccles-Skidmore, a correctional

counselor at Indiana Boys School. *See* dkt. 88-27 (testifying that Mr. Weisheit was "not a behavior problem" and that he was hospitalized for multiple weeks following a suicide attempt). The Indiana Boys School records might well have allowed counsel to paint a fuller picture for the jury of Mr. Weisheit's overall situation.

However, as the Indiana Supreme Court noted, the records might just as easily have provided evidentiary ammunition for the prosecution. The available records included a psychological assessment recounting that Mr. Weisheit "shows no remorse for his victims." Dkt. 89-4 at 154. The same assessment reported that Mr. Weisheit was "found to be manipulative with his suicidal ideation." *Id.*; *see also id.* at 155 ("When caught, Jeff almost always fabricated a suicide story. . . . Jeff later admits that he was just being manipulative in his suicidal ideations."). The reports further note that Mr. Weisheit admitted to shooting a dog during one of his several runaway attempts. *Id.* at 155 ("He shot their dog when he allegedly tried to bite Jeff."). Perhaps most troubling was the psychological assessment which noted Mr. Weisheit's "stated infatuation with movies and books about 'psycho killers and people that go crazy.' Jeff states that he thinks it would be fun to go crazy and be involved in these sort of crimes." *Id.* at 156−57. These details, if presented to a jury, would obviously have bolstered the prosecution's argument that Mr. Weisheit was a depraved and remorseless murderer. The Indiana Supreme Court therefore in our view reasonably ruled that counsel's failure to obtain Mr. Weisheit's Indiana Boys School records did not necessarily prejudice him during the penalty phase of trial.

## I.     Mitigation Experts—Ineffective Assistance of Counsel (Claim 24)

Mr. Weisheit includes in his litany of claims advanced here that his trial counsel was ineffective during the penalty phase of trial for the reasons of his (1) failing to call Dr. Philip Harvey as a witness and (2) failure to investigate his history of brain damage and to call an expert

witness comparable to Dr. Ruben Gur to testify about that condition. We address each of these issues below.

### 1.    Dr. Harvey

The Indiana Supreme Court ruled that trial counsel's failure to call Dr. Harvey was neither a deficient representation nor prejudicial to his defense. Our review allows us to conclude as well that both of these decisions were reasonable.

The post-conviction record shows that Dr. Harvey conducted one assessment of Mr. Weisheit in preparation for trial. Dkt. 88-35 at 177−80 (Phillip Harvey testimony). He had apparently planned to conduct another assessment prior to trial, but his medical practice group informed him that he was not eligible for compensation for assessments of non-patients. *Id.* at 181−83. In response to that notification, Dr. Harvey sent Mr. Weisheit's defense team the following email:

> We have just been informed that as of the first of this year, we can no longer be paid as individuals for the assessment [sic] of any forensic cases that involve direct contact with clients. This income is now seen to be directly payable to our Medical Practice. As my salary is already way more than covered, I can't spend two days seeing a forensic case for no money. This does not preclude testimony on previously seen cases. Let me try to find you someone else who could do an assessment for you, but I can't. I will have to restrict my testimony to the data that I previously collected prior to this rule.

Dkt. 89-7 at 55.

Trial counsel concluded, based on this information, that Dr. Harvey was "bailing out" of the case. Dkt. 88-34 at 150. Dr. Harvey did provide a summary report for use by the defense team's subsequent expert. *Weisheit II*, 109 N.E.3d at 986. Consequently, believing that Dr. Harvey's services were no longer available, counsel engaged a replacement expert, Dr. David Price.

Dr. Price reviewed Dr. Harvey's report and also performed his own independent psychological assessments of Mr. Weisheit, which included evaluations conducted over four

sessions in April 2012 and December 2012. Dkt. 88-27 at 188−89 (David Price testimony). Dr. Price testified during the penalty phase as to his conclusions, including Dr. Harvey's observations as well. *Id.* at 218−19. Dr. Price diagnosed Mr. Weisheit as experiencing attention deficit hyperactivity disorder (ADHD), predominant hyperactive impulse; cognitive disorder, not otherwise specified; and bipolar disorder, not otherwise specified. *Id.* at 201. These diagnoses were based on a review of medical records dating back Mr. Weisheit's childhood and through his young adulthood as well as Dr. Price's personal observations and assessments and an MRI scan. *Id.* at 187−201. Dr. Price incorporated Dr. Harvey's report describing an apparent manic episode that occurred during Dr. Harvey's evaluation. *Id.* at 218−19.

Based on these facts, the Indiana Supreme Court concluded that counsel's performance was not deficient in adjusting to the unavailability of Dr. Harvey, given that Dr. Harvey had "contacted counsel, told counsel he could not do future evaluations and indicated he would recommend his replacement." *Weisheit II*, 109 N.E.3d at 986. Mr. Weisheit characterizes the Supreme Court's conclusion as unreasonable, since Dr. Harvey also testified during the post-conviction hearing that he would have been willing to testify at trial, even though he was unavailable to perform any further in-person assessments. Dkt. 67 at 185.

Mr. Weisheit's attempt to portray his trial counsel's misunderstanding of Dr. Harvey's letter falls short of establishing ineffective assistance. He must show that trial counsel's misunderstanding was unreasonable under the circumstances (*Strickland*, 466 U.S. at 690−91), and he must show that the Indiana Supreme Court's failure to find as much was likewise unreasonable. *Richter*, 562 U.S. at 105. We hold that Dr. Harvey's after-the-fact testimony as to his willingness and availability to testify at trial does not overcome the "doubly deferential" standard of review applicable here in our court. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Likewise, Mr. Weisheit has failed to demonstrate that the Indiana Supreme Court's prejudice determination was unreasonable. He faults the Indiana Supreme Court for failing to recognize that "experts are not fungible," dkt. 107 at 55, and he maintains that Dr. Harvey had "special expertise" and that only Dr. Harvey had "directly observed Weisheit in a manic state." *Id.* at 107. However, the Indiana Supreme Court's conclusion that Dr. Price "capably testified about Weisheit's mental health conditions," was, in our view, altogether reasonable as was its conclusion that anything extra Dr. Harvey may have contributed to the trial proceedings was not likely to have swayed the jury (*Weisheit II*, 109 N.E.3d at 986).

Accordingly, having concluded that the Indiana Supreme Court's deficiency and prejudice determinations were reasonable, § 2254(d) bars further relief based on trial counsel's alleged ineffectiveness.

### 2.    Dr. Gur

Mr. Weisheit next argues that his trial counsel should have called Dr. Ruben Gur, or some other similarly well qualified neuropsychologist, to testify about his history of head injuries and the manner in which they contributed to his impulse to set fire to his house, after leaving Caleb and Alyssa inside.

Dr. Gur testified at Mr. Weisheit's post-conviction hearing as to his review of Mr. Weisheit's self-reported injuries to other experts, identifying several possible traumatic brain injuries.[8] Dkt. 88-34 at 86−90 (fell on sidewalk at age eight, requiring stitches to back of head); *id.* at 94 (fell off roof at age 14); *id.* at 46−47 (punched in the nose at age sixteen); *id.* at 47−48 (car accident at age sixteen, requiring stitches to head); *id.* at 95 (car accident at age seventeen,

---

[8] Dr. Gur's assessment seems to have been based on a baseline expectation that active young males will experience some number of traumatic brain injuries. "Active, especially boys, will get into situations where they will get [traumatic brain injuries] and it's almost unavoidable." Dkt. 88-34 at 45−46.

resulting in lost consciousness); *id.* at 96 (car accidents at age twenty-one and twenty-two, one of which required stitches).

Dr. Gur explained that such traumatic brain injuries might produce symptoms that mimic or exacerbate bipolar disorder. *Id.* at 50−51 ("They can be very happy one moment and then go from that to an outburst of rage or uncontrollable crying in another moment."). According to Dr. Gur, Mr. Weisheit's behavior in certain respects is consistent with multiple traumatic brain injuries. *Id.* at 54−55 ("He had difficulty in school. Throughout his childhood he is behaving like someone who had t.b.i. He is impulsive. He gets into fights. He gets into mischief of all sorts.").

The Indiana Supreme Court did not resolve the issue of any deficiency by trial counsel in failing to call Dr. Gur as a witness, but it did conclude that the failure to call Dr. Gur to testify was not prejudicial, in view of the fact that "the evidence of Weisheit's brain injuries (was) speculative." *Weisheit II*, 109 N.E.3d at 987. We hold that that determination by the Indiana Supreme Court was also reasonable.

Mr. Weisheit presented evidence at the penalty phase of trial of traumatic brain injury. *See* dkt. 87-27 at 212 (Dr. Price testified that Mr. Weisheit "had a cognitive disorder related to having prior cumulative traumatic brain injury); *id.* at 236 ("[H]e's had repeated concussions. That's what you're reading about when you hear all this stuff with NFL players about chronic traumatic encephalopathy. It's the cumulative process of repeated concussions on the brain and on that person's emotional functioning and mental functioning. So, yes, that would have an impact on him every day he wakes up."). As the Supreme Court noted, Dr. Gur's testimony did not include more contemporaneous medical evidence with regard to the purported traumatic brain injuries. *Id.* ("[Dr. Gur's] opinion that Weisheit suffered from concussions was largely based on Weisheit's self-reports and he could not point to medical records that documented each of the alleged

concussions or other traumatic brain injury."). Dr. Gur acknowledged that he could make probabilistic determinations as to whether Mr. Weisheit experienced traumatic brain injury based only on the reports he reviewed. *See*, *e.g.*, dkt. 88-34 at 89−90 ("Fifty-five percent" likelihood that the fall onto a sidewalk at age eight resulted in a concussion). Because we view the Indiana Supreme Court's prejudice determination as reasonable, § 2254(d) bars relief on this claim.

### J.      James Aiken Testimony (Claims 26 and 27)

#### 1.      Trial court's evidentiary ruling (Claim 26)

During the penalty phase of the trial, the trial court excluded testimony by James Aiken regarding the Indiana Department of Correction's ability to provide safe housing to Mr. Weisheit, if he were to receive an executed sentence other than death. Mr. Weisheit challenges this ruling as violative of his Eighth and Fourteenth Amendment rights. Well-established Supreme Court precedent does clearly direct that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. . . . [S]uch evidence may not be excluded from the sentencer's consideration." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). "But the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit." *Oregon v. Guzek*, 546 U.S. 517, 526 (2006).

The Indiana Supreme Court adjudicated this claim on direct appeal, setting forth the correct legal rule based on *Skipper* and agreeing with Mr. Weisheit that "error would ensue if the trial court precluded the defendant from introducing otherwise admissible evidence for the explicit purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment." *Weisheit I*, 26 N.E.3d at 10 (cleaned up). Even so, the trial court

did not abuse its discretion in excluding Mr. Aiken's testimony under Indiana evidentiary rules, according to the Indiana Supreme Court. *Id.*

The trial court's ruling did not prevent *all* opinion testimony about Mr. Weisheit's future dangerousness. This case is therefore distinguishable from the out-of-circuit cases Mr. Weisheit cites in which the state trial court categorically rejected certain kinds of evidence about a defendant's future behavior. *See Lawlor v. Zook*, 909 F.3d 614, 629−33 (4th Cir. 2018) (holding that exclusion of opinion testimony about defendant's future dangerousness in prison, rather than "in society," was unreasonable application of clearly established Supreme Court law); *Davis v. Coyle*, 475 F.3d 761, 770 (6th Cir. 2007) (same where state court excluded "testimony concerning [petitioner's] exemplary behavior on death row" before resentencing).

Here, the trial court's decision to exclude Mr. Aiken's testimony was based on his lack of qualification to offer such opinion testimony. Dkt. 88-27 at 181 ("[I]n terms of projecting in the future, I just, I don't believe there's a foundation as an expert or skilled witness."). The trial court based its ruling on Indiana Rules of Evidence 701 ("Opinion Testimony by Lay Witnesses") and 702 ("Testimony by Expert Witnesses"). *Id.* Our review of this issue is limited because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67−68 (1991); *see Sennholz v. Strahota*, 722 Fed. App'x 569, 571 (7th Cir. 2018) (state court's ruling on admissibility of opinion testimony "is a determination of state law by the state court and therefore is not subject to our review").

We find no basis for concluding that the Indiana Supreme Court unreasonably applied *Skipper* or any other clearly established Supreme Court precedent, thus this claim is **denied**.

### 2.      Ineffective assistance of counsel

Mr. Weisheit raises a related claim arguing that trial counsel was ineffective for his failure to make an adequate offer of proof as to Mr. Aiken's testimony.

The Supreme Court fully considered and adjudicated this claim as well on appeal, holding that even if defense counsel were deficient for failing to make a better offer of proof, Mr. Weisheit was not prejudiced by that failure. *Weisheit II*, 109 N.E.3d at 988. This holding was based on two rationales.

First, as the Supreme Court stated: "It is speculative to say Aiken's testimony would have been admissible" under Indiana law.[9] *Id.* This conclusion reflects Mr. Aiken's limited study of Mr. Weisheit's record and his limited current knowledge about Indiana's classification procedures. *Id.* ("Aiken testified that he spent just 30 to 45 minutes with Weisheit the night prior to appearing in court. . . . He admitted he had not reviewed anything regarding how an Indiana prison would house an inmate convicted of murdering children."). On evidentiary questions, our court is not authorized to second-guess the Indiana Supreme Court's application of Indiana evidentiary law. *McGuire*, 502 U.S. at 67−68; *Sennholz*, 722 Fed. App'x at 571.

The Supreme Court also ruled that, even if Mr. Aiken had testified, he "would not have aided [Mr. Weisheit's] mitigation cause", because Mr. Aiken would have been confronted on cross-examination with Mr. Weisheit's less-than-stellar disciplinary records while in custody, to wit: "35 incident reports were filed regarding Weisheit from April 2010 to May 2011. Incidents include Weisheit threatening to kill an EMT who was dispensing medication, threatening officers

---

[9] The post-conviction trial court held that counsel's performance was deficient and that Mr. Aiken's testimony would have been admissible under Indiana Rule of Evidence 702(a) had counsel laid the proper foundation. Dkt. 22-34 at 7−16. However, we are obligated to examine the "last reasoned state-court decision" in adjudicating the claim. *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013); *Thurston v. Vanihel*, 39 F.4th 921, 928 (7th Cir. 2022).

and challenging them to fight him, threatening other inmates, destroying several pieces of jail property, urinating in the hallway and concealing 'multiple, sharp chicken bones' in his mouth during a search." *Weisheit II*, 109 N.E.3d at 988. These incident reports were not introduced during the guilt or penalty phases of Mr. Weisheit's trial, and Mr. Weisheit does not dispute the Supreme Court's factual determination that they would likely have been introduced to challenge the basis of Mr. Aiken's opinions, had he testified. Thus, we hold that the Supreme Court reasonably concluded that Mr. Aiken's testimony, on balance, would not have redounded to the benefit of Mr. Weisheit's mitigation arguments. The Supreme Court also reasonably applied *Strickland* in concluding that Mr. Weisheit had failed to show a reasonable probability that the sentencing outcome would have been different, even if counsel had made the offer of proof.

### K.    Cumulative Prejudice (Claim 30)

Finally, Mr. Weisheit contends that the cumulative effect of counsel's penalty phase deficiencies have caused him a significant and independent prejudice. In advancing his claim, he concedes that some of the specific, individual deficiencies underlying it have been defaulted (dkt. 107 at 10), but argues nonetheless that "even the cumulative effect of trial counsel's deficient penalty phase  performance presented in state habeas proceedings merits relief." *Id.* at 67. We therefore address whether the cumulative effect of Mr. Weisheit's non-defaulted claims regarding counsel's alleged deficiencies compel a separate finding of prejudice.

The Indiana Supreme Court adjudicated this claim in the post-conviction appeal, stating as follows: "[E]ven assuming counsel was deficient, Weisheit has not demonstrated prejudice. Indeed, he has not shown that he would be given a different sentence even if counsel had committed none of the alleged errors in light of the nature of this particular crime—the murder of

two small children—and the overwhelming evidence of his guilt." *Weisheit II*, 109 N.E.3d at 992. This conclusion in our judgment constitutes a reasonable application of *Strickland*.

Mr. Weisheit's three, specific instances of deficiency by counsel have each been previously addressed as to their individual prejudicial impact: (1) counsel's failure to object to the police detective's opinion testimony regarding the cause of the fire; (2) counsel's failure to call Dr. Gur or another similarly qualified expert to testify about Mr. Weisheit's possible traumatic brain injuries; and (3) counsel's failure to make an adequate offer of proof as to Mr. Aiken's testimony about the Indiana Department of Correction's ability to safely house Mr. Weisheit.

Taken together, we find no reasonable probability that, had they all not occurred, a different outcome would have resulted from Mr. Weisheit's penalty phase. With or without the police detective's testimony, the evidence of Mr. Weisheit's guilt was overwhelming. Similarly, regarding Mr. Aiken's testimony, it is at best unclear whether it would have had a net positive effect as mitigation evidence in his favor. Assuming Mr. Aiken would have testified that in his opinion the Indiana Department of Correction was capable of safely housing a prisoner such as Mr. Weisheit, that opinion likely would have been impeached by Mr. Weisheit's record of bad conduct during his pretrial custody, to wit, his "threatening to kill an EMT who was dispensing medication, threatening officers and challenging them to fight him, threatening other inmates, destroying several pieces of property, urinating in the hallway and concealing 'multiple, sharp chicken bones' in his mouth during a search." *Weisheit II*, 109 N.E.3d at 988. Thus, only the omission of Dr. Gur's testimony remains for review, which in our judgment, if included, would have likely had no more than a minimal impact on the outcome of proceedings because his opinion was based primarily on Mr. Weisheit's own, self-reported head injuries.

Thus, we hold that the Indiana Supreme Court's resolution of this cumulative impact claim as part of the post-conviction appeal was reasonable and, as such, pursuant to § 2254(d), relief is barred.

## IV.     Motion to Stay to Restore Competence

Separate from the motion to stay to exhaust state court remedies, Mr. Weisheit's counsel has sought a stay of this litigation based on Mr. Weisheit's alleged temporary incompetence. Dkt. 95.

A state inmate, including one who has been sentenced to death, has no right to competence in § 2254 habeas corpus proceedings. *Ryan v. Gonzales*, 568 U.S. 57, 64−73 (2013). Nevertheless, a district court is permitted to stay § 2254 proceedings when a "petitioner's claim could substantially benefit from the petitioner's assistance" and there is "reasonable hope of competence" in the foreseeable future. *Id.* at 76−77.

Here, we do not believe that Mr. Weisheit's claims would substantially benefit from his participation and assistance, assuming he is impaired or experiencing diminished capacity. His claims are for the most part either all defaulted or otherwise barred by 28 U.S.C. § 2254(d). A stay is therefore both unnecessary and inappropriate. We need not further address Mr. Weisheit's factual claim of incompetence. *See id.* at 74 ("[A] stay is not generally warranted when a petitioner raises only record-based claims subject to 28 U.S.C. § 2254(d).").

## V.     Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). A state prisoner must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). A district court

must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Habeas Corpus Rule 11(a).

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.'" 28 U.S.C. § 2253(c)(2). Where a claim is resolved on procedural grounds, a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim and about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016).

Here, though we have confidence in the correctness of our rulings, we concede that reasonable jurists could disagree about the merits of Mr. Weisheit's ineffective assistance of trial counsel claim and his ineffective assistance of appellate counsel claim. *See Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("[A] certificate [of appealability] identifying ineffective assistance of counsel brings up all of counsel's actions."). Reasonable jurists could also disagree about whether Claims 1, 2, 3, 5, 6, 7, 8, 10, 13, 14, 17, 18, 19, 20, 21, 22, 25, 29, 30, 31, 32, and 33 have been procedurally defaulted or are instead unexhausted. A certificate of appealability is therefore **granted** as to these issues.

## VI.    Conclusion

The petition for writ of habeas corpus is **denied**. A certificate of appealability is **granted**. Final judgment shall now enter.

**IT IS SO ORDERED.**


Date:    _11/2/2022_                         _Sarah Evans Barker_
                                             SARAH EVANS BARKER, JUDGE
                                             United States District Court
                                             Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email